UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**BINGHAMTON MOTOR CAR CORPORATION d/b/a EMPIRE MOTOR CAR**,

                *Plaintiff*,

      *vs.*                                           Civil Action No.
                                                                 3:08-cv-818-TJM-DEP

**MERCEDES-BENZ USA, LLC**,

                *Defendant*.

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF <u>DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

HISCOCK & BARCLAY, LLP
Robert A. Barrer
Bar Roll No. 101099
Office and Post Office Address
One Park Place
300 South State Street
Syracuse, New York  13202-2078
Telephone:  (315) 425-2704
Facsimile:  (315) 425-8544
E-Mail:  rbarrer@hblaw.com

HOGAN & HARTSON LLP
John J. Sullivan
Bar Roll No. 510802
875 Third Avenue
New York, New York  10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
E-Mail:  jsullivan@hhlaw.com

                                *Attorneys for Defendant*

# TABLE OF CONTENTS

Page

OVERVIEW ........................................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT .......................................................................................................................8

I.   MBUSA IS ENTITLED TO SUMMARY JUDGMENT .........................................8

II.  EMPIRE'S CLAIMS HAVE NO MERIT...............................................................10

CONCLUSION..................................................................................................................14

Defendant Mercedes-Benz USA, LLC ("MBUSA") respectfully submits this memorandum (i) in opposition to the motion for partial summary judgment made by plaintiff Binghamton Motor Car Corp. d/b/a Empire Motor Car ("Empire") and (ii) in support of MBUSA's cross-motion for summary judgment dismissing Empire's claims that MBUSA wrongfully refused to consider or approve an asset purchase agreement signed by Empire in November 2008 (the "2008 Buy-Sell").

## Overview

On May 9, 2008, MBUSA served Empire with a Notice of Termination based upon (among other things) Empire's failure to perform a longstanding contractual obligation to relocate its Mercedes-Benz franchise to a new facility that complied with MBUSA's facility standards. Several months thereafter, Empire attempted to transfer its Mercedes-Benz franchise assets "free and clear" of the Notice of Termination. There is a long line of decisions – including a recent one by this Court – holding that a dealer may not avoid the consequences of a Notice of Termination in this fashion.

Based on these cases, Empire's motion for partial summary judgment should be denied and MBUSA's cross-motion should be granted. The central "fact" on which Empire bases its motion – that Empire was not attempting to transfer its Mercedes-Benz franchise rights (and therefore the cases are distinguishable) – is disputed not only by MBUSA, but by Empire's own pleadings and its own expert's report.

In the Amended Complaint, Empire alleges that the transaction at issue was an agreement "to sell its operating assets to a third-party, including [its] Mercedes-Benz franchise." [Amended Complaint, ¶ 23 (emphasis added).] The very claims which Empire has pleaded – and on which Empire seeks summary judgment – describe MBUSA's wrongful conduct as refusing to consent to "a sale of the franchise" and "a proposed transfer of the franchise." [Amended Complaint,

¶¶ 42, 52; see id. ¶¶ 37, 62.]  Moreover, Empire's expert witness has submitted a report stating that Empire asked him "to calculate damages from MBUSA's refusal to approve the sale of [Empire's] Mercedes-Benz franchise."  [Sullivan Aff., Ex. 1, ¶ 2.][1]  Yet, Empire bases its motion on the premise that it was not attempting to sell or transfer the Mercedes-Benz franchise!

MBUSA submits that Empire's recent amendment of its complaint to add these claims, and the instant motion, are an attempt to escape the consequences of Empire's indisputable failure to perform the contractual promises it made in 2004 to induce MBUSA to appoint Empire as a Mercedes-Benz dealer.  Empire's motion should be denied, and MBUSA's cross-motion should be granted.

## STATEMENT OF FACTS

In or about December 2003, Don Lia, the principal owner of Empire, signed an Asset Purchase Agreement ("APA") with Gardner Motors, Inc. d/b/a Feduke Motor Company ("Feduke") to acquire the Audi, Mercedes-Benz, Porsche and Volkswagen ("VW") dealership assets of Feduke.  The APA recited that Lia desired to obtain appointments "as an authorized Audi and Volkswagen dealer" at 191 Front Street, Binghamton – Feduke's existing location – but to obtain an appointment "as an authorized Mercedes-Benz and Porsche dealer at 1000 Vestal Parkway, Vestal, New York."  [Stephan Aff., ¶¶ 3-4.]

In his subsequent application for a Mercedes-Benz dealer agreement, Lia confirmed his intention to relocate the Mercedes-Benz dealership to Vestal.  MBUSA's "Market Team" met with Lia, his proposed General Manager Wayne Hall, and other members of Lia's organization

---

[1] References in this Memorandum are as follows:  Affidavit of Karl A. Stephan, sworn to June 26, 2009 ("Stephan Aff."); Affidavit of John J. Sullivan, sworn to June 26, 2009 ("Sullivan Aff."); Declaration of Wayne Hall, dated June 3, 2009 ("Hall Decl."); Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, dated June 3, 2009 ("Pl. Mem.").  References in the form "Doc. ___" will be used to refer to the docket number and pages of previously-filed documents where it may assist in finding the material cited.

on March 3, 2004, at Lia's office in Huntington, New York, to discuss the application.

According to an MBUSA memo summarizing that meeting:

> At this time the Market Team also made it clear that MBUSA will not approve the current location or facility.  Mr. Lia understood and agreed as he has seen the current location and facility and will propose a new location located on the Vestal Parkway and a facility that will be proposed to MBUSA for its critique and subsequent recommendations for renovation, expansion, or whatever is deemed necessary by MBUSA.

[Stephan Aff., ¶ 5.]  The parties also discussed Mr. Hall's proposed role in the dealership:

> We spoke about what Mr. Hall's plans are which are that he plans to relocate to the Binghamton area pending approval of the buy/sell and him as the proposed G.M.  Mr. Lia stated that Mr. Hall will only have the Binghamton operation as his only operation of responsibility and commits to Mr. Hall being the daily operator.

[Id., ¶ 6.]

Lia's promises concerning the facility and Hall's role as the on-site, full-time GM were part of the inducement to MBUSA to approve the buy-sell.  These promises were incorporated into the dealership agreements signed by Empire and MBUSA, i.e., (i) the Mercedes-Benz Passenger Car Dealer Agreement and (ii) the Mercedes-Benz Light Truck Dealer Agreement (each a "Dealer Agreement" and collectively, the "Dealer Agreements").  [Stephan Aff., ¶ 7.]

Each agreement had an "Effective Date" of August 6, 2004, and each was for a term expiring on December 31, 2006.  [Hall Decl., Ex. D, Doc. 27-6 at p. 6.]  Each agreement also contained a "Dealer Improvement Addendum" (the "2004 DIA"), in which Empire agreed to relocate the dealership to a new facility by August 2006:

> Dealer acknowledges and agrees that the current facility located at 191 Front Street, does not meet MBUSA's current or future facility requirements. As such, within 90 days from the effective date ("Effective Date") herein Dealer agrees to provide to MBUSA valid documentation as to Dealer's commitment to acquire or lease a mutually acceptable site in Binghamton, NY (or surrounding area), for the construction or renovation of a new full sales and service dealership facility to meet MBUSA's reasonable facility requirements . . . . Dealer will begin construction/renovation of the new dealership pursuant to the above plan within 9 months from the Effective Date with the completion and the relocation of all

> Mercedes-Benz operations to the new dealership no later than two years from the Effective Date or as the parties may otherwise agree. Time is of the essence with respect to the timeframes set forth herein.
>
> It is acknowledged and agreed by the parties that the Dealer's agreement to relocate the Mercedes-Benz operations to a new dealership facility is a significant factor in MBUSA approving the issuance of the Dealer Agreements to Dealer and that Dealer's failure to relocate the Mercedes-Benz operations to a new dealership as set forth above shall constitute a material breach of this agreement . . . .

[Hall Decl., Ex. D, Doc. 27-6 at p. 55.]  In addition, Hall was named in the Dealer Agreements as the "Dealer Operator" along with Lia.  The Dealer Agreements provide that the Dealer Operator "shall have full managerial authority for Dealership Operations, shall continually provide his or her personal services in operating the dealership, and shall be <u>physically</u> <u>present</u> at the Dealership facilities <u>on a full-time basis</u>."  [<u>Id</u>., ¶ E, Doc. 26-7 at p. 2 (emphasis added).]

Empire thereafter presented MBUSA with a proposal to relocate the dealership to 1000 Vestal Parkway – the same address stated in the APA.  MBUSA approved this proposal in August 2005.  [Stephan Aff., ¶ 10.]  Empire, however, breached its contractual obligation to relocate the dealership by August 2006.  [<u>Id</u>., ¶ 11.]  Empire also breached is promises concerning Hall, who (i) never relocated to Binghamton, (ii) never served as an on-site, full-time General Manager at Binghamton, and (iii) continued to manage other Lia dealerships.  [<u>Id</u>.]

In addition, Empire's sales performance was seriously deficient.  While Empire claims on this motion that the Feduke dealership was "foundering," Feduke was more successful in selling new Mercedes-Benz vehicles than Empire.  For example, Feduke sold 80 new vehicles in 2002, when MBUSA's national sales were at 213,225 units.  In 2006, Empire sold only 55 new Mercedes-Benz vehicles despite an increase in MBUSA's national sales of more than 15% (to 247,793 units).  In 2006, Empire's sales were the worst of the 93 Mercedes-Benz dealers in MBUSA's Eastern Region.  [Stephan Aff., ¶ 12.]

Prior to the expiration of Empire's Dealer Agreements on December 31, 2006, MBUSA sent a letter to Empire, dated December 11, 2006, advising Empire that it would be "renewed for only a one year term" due to "long-standing facility and other performance deficiencies that preclude your Mercedes-Benz operations from meeting reasonable sales and service expectations." [Stephan Aff., ¶ 13 and Ex. D.] The letter continued:

> At this time, there is no clear indication from [Empire] as to when or how these deficiencies might be resolved. Therefore, a Dealer Improvement Addendum will be attached to the Agreement which shall require [Empire] to resolve its deficiencies within a reasonable period of time. In accordance with the foregoing, MBUSA hereby reserves all of its rights under the Agreement with respect to the remedy of the deficiencies at [Empire].

The one-year renewal for 2007 was not signed by January 1, 2007. At a meeting on March 8, 2007, MBUSA advised Lia and Hall that the dealership needed to cure its facility, sales, fixed operations, personnel, and profitability deficiencies and that Empire's agreement to remedy those deficiencies would be a condition of the one-year renewal. For his part, Lia advised MBUSA that regretted acquiring the dealership and that he was looking for a buyer. [Stephan Aff., ¶¶ 14-16.]

By letter dated March 28, 2007, MBUSA followed up the meeting by sending Empire a "business plan" which "summarizes the action steps that need to be taken" by Empire. Those steps included complying with its facility obligations and providing a "full-time GM on-site to oversee new and used car sales growth." [Id., ¶ 17 and Ex. E.]

Meanwhile, however, Empire signed an Asset Purchase Agreement dated March 27, 2007 (the "2007 Buy-Sell") with Richard Perry. [Hall Decl., Ex. E.] MBUSA provided Perry with the application forms for approval of the 2007 Buy-Sell. [Hall Decl., Ex. F.] MBUSA and representatives from Mercedes-Benz Financial, an affiliate of MBUSA, also met with Perry to discuss his candidacy. [Stephan Aff., ¶ 19.]

Perry, however, never submitted the required application materials to MBUSA.  On or about July 27, 2007, Perry abandoned the 2007 Buy-Sell transaction.  MBUSA understands that Perry did so because he did not have the capital necessary to own and operate the dealership. [Stephan Aff., ¶ 20.]

After Perry abandoned the 2007 Buy-Sell, MBUSA reminded Empire of its ongoing deficiencies and its need to sign a renewal of the Dealer Agreements.  On or about September 5, 2007, Empire signed the one-year renewal for calendar year 2007, which included a new Dealer Improvement Addendum (the "2007 DIA").  [Stephan Aff., ¶ 22.]

The 2007 DIA not only reiterated Empire's obligation to relocate as agreed in the 2004 DIA, but also addressed Empire's need to cure its sales, personnel, and capital deficiencies. With respect to the facility, the 2007 DIA provided:

> Dealer's current facility is not in compliance with Dealer Agreement space requirements as detailed in the Facility Space Addendum attached, nor is the facility in total compliance for Mercedes-Benz brand image and corporate identity requirements.
>
> Dealer has received MBUSA approval to relocate to a more desirable location in Vestal, NY. Within nine months from the effective date herein, dealer to submit plans to MBUSA (facility plan) to remedy the aforementioned deficiencies by relocation of the current facility. Additionally, the plan must include all of the Autohaus facility requirements as defined for all dealers by MBUSA. The plan must also establish a project timeline with specific milestone dates agreeable to MBUSA. In no event should the completion of the new facility exceed December 31, 2008. Estimated costs for the new facility should be incorporated into a pro-forma and also be submitted along with the facility proposal.

[Hall Decl., Ex. G; Stephan Aff., ¶¶ 22-23 and Ex. F.]

Despite having previously submitted facility plans for the Vestal relocation, and despite agreeing in the 2007 DIA to submit new plans by September 30, 2007, Empire failed to do so. [Stephan Aff., ¶ 24.]  In fact, Empire apparently did not even engage an architect to submit new plans until on or about February 5, 2008, and did not submit the plans until February 25, 2008 –

about five months late.  [Id., ¶ 25.]  Empire apparently spent most of this period unsuccessfully attempting to find another buyer for the dealership rather than attempting to cure its deficiencies as agreed to in the 2007 DIA.  [Id., ¶ 24.]

MBUSA served a Notice of Termination on May 9, 2008.  [Stephan Aff., ¶ 28; Hall Decl., Ex. I.]  Empire brought this suit on July 23, 2008, and moved for a preliminary injunction to prevent its franchise from terminating prior to a decision on the merits.  Rather than fight the preliminary injunction, MBUSA agreed to continue doing business with Empire pending this Court's decision on the merits, pursuant to the terms and conditions of a Stipulation that was "So Ordered" by the Court on August 25, 2008.  That Stipulation provided, among other things, that:

> This Stipulation and Order (i) shall not modify, increase or diminish any of the parties' rights or obligations as they existed prior to their execution hereof, [and] (ii) is without prejudice to MBUSA's position that . . . because of the issuance of the Notice of Termination, Empire has no right to transfer its Mercedes-Benz franchise assets, except subject to the Notice of Termination[.]

After the Stipulation was entered and the parties joined issue in this action, Empire submitted another buy-sell with Perry dated November 17, 2008 (the "2008 Buy-Sell"). [Stephan Aff., ¶ 28.]  As alleged in Empire's Amended Complaint, the 2008 Buy-Sell was an agreement "to sell [Empire's] operating assets to a third-party, including [Empire's] Mercedes-Benz franchise."  [Amended Complaint, ¶ 23.]

MBUSA had already advised Empire – in the very words of the August 25, 2008 Stipulation that Empire signed – that it was "MBUSA's position that . . . because of the Notice of Termination, [Empire] has no right to transfer its Mercedes-Benz franchise assets, except subject to the Notice of Termination."  MBUSA's counsel reiterated this position to Empire's counsel when MBUSA's counsel was advised that a new buy-sell was being submitted.  [Sullivan Aff., ¶¶ 4-8.]  MBUSA formally advised Empire that it would not consider the 2008 Buy-Sell in a letter dated January 15, 2008.  [Stephan Aff., ¶ 29; Hall Decl., Ex. K.]

**ARGUMENT**

**I.     MBUSA Is Entitled to Summary Judgment**

It is well-established that a dealer's failure to perform its contractual promise to provide a new or renovated facility is good cause for termination, especially where, as here, the promise was made to induce the franchisor to appoint the promisor as an authorized dealer in the first place. Wagner v. Wagner Auto Sales, Inc. v. Land Rover North America, Inc., 548 F.3d 38 (1st Cir. 2008); Maple Shade Motor Corp. v. Kia Motors of America, Inc., 384 F. Supp. 2d 770, 777-78 (D.N.J. 2005) (granting summary judgment), aff'd, 260 Fed. Appx. 517 (3d Cir. 2008).

By entering into the 2008 Buy-Sell, Empire sought to avoid the consequences of its facility and other breaches – i.e., to nullify the Notice of Termination by selling its franchise rights "free and clear" of that Notice. It is well-established, however, that while the holder of a contract right can generally transfer whatever rights it has, it cannot transfer more rights than it has. See Restatement (Second) of Contracts § 336, comment b (1981) (assignment of contractual right "transfers what the assignor has but only what he has"). New York adheres to this "elementary ancient law." Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 36 N.Y.2d 121, 126 (1975); see Federal Deposit Ins. Co. v. New York, 928 F.2d 56, 60 (2d Cir. 1991).

Based on this fundamental principle of contract law, the courts have consistently held that a dealer subject to a notice of termination may not transfer its franchise rights "free and clear" of that notice of termination. H-D Michigan, LLC v. Sovie's Cycle Shop, 2009 WL 1740337 at *5 (N.D.N.Y. June 18, 2009) (McAvoy, J.) (summary judgment granted) (Appendix A hereto); Authorized Foreign Car Specialists of Westfield, Inc. v. Jaguar Cars, Inc., 1997 WL 33812275 (D.N.J. 1997) (summary judgment granted) (App. B), aff'd, 1998 WL 34347444 (3d Cir. 1998) (App. C); Maple Shade Motor Corp. v. Kia Motors America, Inc., 260 Fed. Appx. 517 (3d Cir. Jan. 11, 2008) (affirming summary judgment ruling that dealer had no franchise rights "free and

clear" of termination notice); Chic Miller's Chevrolet v. General Motors Corp., 352 F. Supp. 2d 251, 258 & n. 9 (D. Conn. 2005) (summary judgment granted; dealer that was validly terminated "had nothing left to transfer and [manufacturer] could not be found to have breached the dealership contract by failing to approve [a] sale" and "[e]ven if termination has not yet taken effect, a franchisee is only entitled to transfer his interest in any period remaining"); David Glen, Inc. v. Saab Cars USA, Inc., 837 F. Supp. 888 (N.D. Ill. 1993); Simmons v. General Motors Corp., Oldsmobile Div., 180 N.J. Super. 522, 543, 435 A.2d 1167, 1179 (1981), cert. denied, 88 N.J. 498, 443 A.2d 712 (1981); see also Dunkin' Donuts Inc. v. Taseski, 47 F. Supp. 2d 867, 876 (E.D. Mich. 1999) (even if transfer provision of Michigan Franchise Investment law applied, plaintiff-franchisor had no liability for refusing to approve transfer where "defendants' rights under the franchise agreement had already terminated and thus defendants had nothing to transfer") (emphasis removed); Glenn v. Exxon Co., U.S.A., 801 F. Supp. 1290 (D. Del. 1992) (plaintiffs improperly attempted to transfer more than they had, a franchise subject to the termination notice); KFC Corp. v. Goldey, 129 F.R.D. 157, 158 (W.D. Ky. 1990) (franchisee's desire to sell franchise subsequent to termination would improperly require court to "hold the termination to be of no effect").

Here, after the notice of termination was served, Empire sought MBUSA's approval of a buy-sell "free and clear" of that notice. The 2008 Buy-Sell was conditioned on MBUSA's grant of "a standard Sales and Service Agreement" to Perry. [Hall Decl., Ex. K, ¶ "FIVE," Doc. 27-13 at p. 7.] Nowhere did Perry agree to acquire the franchise subject to the pending Notice of Termination and/or agree to accept the risk of the termination being sustained. Accordingly, MBUSA had no obligation to consider, much less approve, the 2008 Buy-Sell. See Authorized Foreign Car Specialists of Westfield, supra, 1997 WL 33812275, at *5 (manufacturer had no

obligation to review buy-sell agreements proposed after notices of termination were served because those agreements were not made subject to the notices; "the most [dealer] had to sell was a franchise subject to those notices and one that would perforce terminate should those notices be sustained").

In short, MBUSA is entitled to summary judgment on Empire's claims relating to the 2008 Buy-Sell.

## II.     Empire's Claims Have No Merit

Based on the legal authority cited above, "Empire concedes that had it attempted to assign its interest in the [Dealer] Agreement to Mr. Perry, then any such assignment would have been subject to MBUSA's purported Notice of Termination." [Pl. Mem. at 13.] Empire argues that this authority is distinguishable, however, because "[t]he proposed transaction between Empire and Mr. Perry is not a sale of franchise rights." [Id. at 11 (emphasis added).] This argument is directly contrary to Empire's own pleadings and its own expert's report. It is also inconsistent with the Dealer Agreements and the New York statutes under which Empire has sued.

In its Amended Complaint, Empire alleges that the 2008 Buy-Sell is an agreement "to sell its operating assets to a third-party, including Empire Motor Car's Mercedes-Benz Franchise." [Amended Complaint (Hall Decl., Ex. C), ¶ 23 (emphasis added).] Empire asserts at least four claims against MBUSA based on MBUSA's alleged refusal to permit a sale or transfer of the franchise: (1) MBUSA violated § 463(2)(k) of the Act by refusing to permit Empire to "sell its franchise" [id., ¶ 37]; (2) MBUSA violated the Automobile Dealer's Day in Court Act ("ADDCA") by "its unreasonable withholding of consent to a sale of the franchise" [id., ¶ 42]; (3) MBUSA breached the Dealer Agreements by "with[o]ld[ing] consent to a proposed transfer of the franchise" [id., ¶ 52]; and (4) MBUSA tortiously interfered with "the potential sale of the

franchise" [id., ¶ 62]. Yet, Empire now claims – contrary to its own pleadings – that the 2008 Buy-Sell was not a proposal to sell or transfer the franchise.

Second, Empire's own expert has explained that the principal reason Perry was willing to offer $1,650,000 for certain Empire hard assets and "good will" was to obtain Empire's Mercedes-Benz franchise rights. Empire's expert, Joseph Roesner, states that he was "asked to calculate damages from MBUSA's refusal to approve the sale of [Empire's] Mercedes-Benz franchise." [Sullivan Aff., Ex. 1, ¶ 2 (emphasis added).] Roesner opines that based on the $239,197 book value of the "hard assets" included in Perry's $1,650,000 offer, Perry "was willing to pay $1,410,805 for the blue sky associated with the three franchises [i.e., Mercedes-Benz, Audi, and VW.]" [Id., ¶ 30.] "Blue sky" is an industry term for the value of the franchise. [Stephan Aff., ¶ 32.] Roesner opines that the blue sky value of the Mercedes-Benz franchise was at least $910,803. [Id., ¶ 33.]

It is difficult to understand how Empire can tell this Court that it was not attempting to sell the franchise when it is simultaneously seeking at least $910,803 in damages for MBUSA's refusal to approve the sale of the franchise.

Third, when Empire states that MBUSA's form of Dealership Agreement is styled as a "personal services agreement, which by its terms is not assignable" [Pl. Mem. at 13], it simply misrepresents the actual terms of the Dealer Agreements. The Dealer Agreements expressly permit transfer with the prior written consent of MBUSA. Section 1X is entitled "Transfer," and subsection A thereof entitled "Sale of Assets or Ownership Interest." Section IX.A expressly permits (with MBUSA's prior written consent) the sale of the dealership's "principal assets" – which include its franchise rights – or of an "ownership interest" – i.e., a stock sale or similar ownership transfer. It provides:

> This is a personal service agreement that MBUSA has entered into in reliance upon the personal qualifications, reputation, integrity, expertise and commitment of Owner and Dealer Operation. For this reason, Dealer agrees to obtain MBUSA's <u>prior written consent to any proposed sale or transfer of Dealer's principal assets in any ownership interest</u>, which consent shall not be unreasonably withheld.

[Hall Decl., Ex. D, Sec. IX.A, Doc. 26-7 at p. 36 (emphasis added).] If Dealer sells an "ownership interest," then obviously the new owner succeeds to the dealer's franchise rights under the Dealer Agreement. If the dealer sells its "principal assets," then obviously (as Empire's own expert attests) those assets include the right to be the franchisee in the dealer's market. Indeed, MBUSA would have no standing to approve or disapprove the transaction – or any reason even to care about it – if dealer were not attempting to sell the right to have a Mercedes-Benz franchise. [See Stephan Aff., ¶ 32.] The Dealer Agreement makes no mention of "substituted owners" or "novated Dealership Agreements" with such "substitutes." [See Stephan Aff., ¶ 32.]

Fourth, the very New York statutes under which Empire has sued protect the dealer's right to sell or transfer its franchise rights. If, as Empire now insists, it was not attempting a "sale of franchise or an interest in the franchise rights" [Pl. Mem. at 11], then it would have no claim under these statutes. Section 463(2)(k) makes it unlawful to "unreasonably withhold consent to the <u>sale</u> or <u>transfer</u> of an interest . . . by a franchised motor vehicle dealer or any partner or stockholder of any franchised motor vehicle dealer." Empire itself describes this as an "obligation to reasonably approve the sale or transfer of an interest in a franchised dealership." [Pl. Mem. at 11.] Section 466 makes it unlawful for a franchisor "upon sale or transfer of a dealership . . . to prevent or attempt to prevent a franchised motor vehicle dealer <u>from obtaining the fair value of the franchise</u> or the fair value of the dealer as a going concern." N.Y. V.T.L. § 466 (emphasis added).

In short, it is Empire's attempt to distinguish the legal authority cited in Point I that is, to use Empire's word, "strained." [Pl. Mem. at 11.] MBUSA's decision not to review the 2008 Buy-Sell did not violate any of Empire's contractual or statutory rights.

MBUSA did not violate Empire's rights under the ADDCA for an additional reason. It is well-established that, to make out a claim under the ADDCA, the dealer must prove that the manufacturer made "'a wrongful demand enforced by threats of coercion or intimidation.'" Empire Volkswagen Inc. v. World-Wide Volkswagen Corp. 814 F.2d 90, 95-96 (2d Cir. 1987). Empire has not alleged or proven any wrongful demand made by MBUSA. Demanding that a dealer perform its contractual obligations is not a wrongful demand. Id. at 96-97; see Wagner & Wagner Motor Sales v. Land Rover North America, Inc., 539 F. Supp. 2d 461 (D. Mass.), aff'd, 547 F.3d 38 (1st Cir. 2008).

The cases cited by Empire are inapposite. Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc., 32 F.3d 528 (11th Cir. 1994), was a lawsuit brought by a disappointed purchaser of a franchise under Florida's statute, which (almost alone among the states) gives standing to the prospective buyer. While it is true that the buy-sell was proposed after a notice of termination, Mercedes did not assert that objection and in fact had approved a prior buy-sell also submitted after the notice of termination. 32 F.3d at 530. In short, the point at issue here was neither raised nor decided in Mike Smith Pontiac.

The other decision Empire cites, Mercedes-Benz of North America, Inc. v. Dep't of Motor Vehicles, 455 So.2d 404 (Fla. Dist. Ct. App. 1984), review denied, 462 So. 2d 1107 (Fla. 1985), did not involve a buy-sell after a notice of termination. It was distinguished on that ground in Authorized Foreign Car Specialists:

> Unlike this case . . . the franchisor [in Mercedes-Benz] issued a
> notice of termination after and in response to the franchisee's

> proposed assignment and also failed to respond to the proposed assignment in writing within the sixty-day statutory period. Thus, in contrast to this action, the franchisee in *Mercedes Benz* was not using an assignment as a device to escape from the adjudication of prior notice of termination by attempting to assign "free and clear" franchise rights to prospective assignee.

1997 WL 33812275, at 4 (citation omitted). Here, of course, Empire is using the 2008 Buy-Sell as just such a device.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for partial summary judgment should be denied, and defendant's cross-motion for partial summary judgment should be granted.

Dated:  June 26, 2009

>                    HOGAN & HARTSON LLP
>
>
>     By:    /s/ John J. Sullivan
>            John J. Sullivan
>            Bar Roll No. 510802
>            875 Third Avenue
>            New York, New York  10022
>            Telephone:  (212) 918-3000
>
>            HISCOCK & BARCLAY, LLP
>            Robert A. Barrer
>            Bar Roll No. 101099
>            Office and Post Office Address
>            One Park Place
>            300 South State Street
>            Syracuse, New York  13202-2078
>            Telephone:  (315) 425-2704
>
>            Attorneys for Defendant